IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,
        Plaintiff,

vs.                                                 No. 17-40074-JTM

HOWARD DALE BURCHFIEL,
        Defendant.

MEMORANDUM AND ORDER

The indictment charges defendant Howard Dale Burchfiel unlawfully possessed a shotgun in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2), having previously been convicted of a felony, namely attempted murder in 2009. The matter is before the court on the defendant's motion to suppress evidence relating to the shotgun. The court heard evidence and argument relating to the motion on January 8, 2020, and denies the motion for the reasons stated at the hearing and as further provided in this Order.

The evidence establishes that on June 17, 2017, at 8:27 in the evening, the Topeka Police Department received a 911 call from an American Medical Response (AMR) employee, reporting a white man, approximately 30-35 years of age, was in possession of a shotgun while on parole and that the man was walking south with a woman in the 1000 block of Harrison Street, entering an alley and going eastbound. Two more calls, made by defendant's mother (Joy Burchfiel) and brother (Billy Shumway), reported that

the defendant was drunk and out-of-control, asking that the dispatcher "send them right now," and then following this up by asking "why aren't you fucking here?" Another call reported that AMR was nearby with a witness to the man shooting off a shotgun.

Officers Gary Schwinn and Jason Oyler responded to the call in their marked patrol vehicle, and their investigation was recorded on their body cameras. Joy Burchfiel greeted the officers by asking that they not "shoot her kid," and that she could not "take this shit anymore." The officers walked down the alley to Shumway's residence at 1008 N.W. Harrison. Shumway identified his brother by name and stated that he had "lost his damn mind." The officers asked if the defendant was armed, but Shumway did not answer. When they asked him again, he responded that "he might." Shumway and Joy Burchfiel indicated that the defendant had left and gone to his own residence. With Shumway's consent, the officers briefly searched the house to determine if the defendant might be inside.

Shumway told the officers the defendant had recently been released on parole, was drunk and belligerent and had broken their window and front gate when they threatened to call his parole officer. Shumway and Joy Burchfiel denied that the defendant had fired a weapon. At some point, however, dispatch informed the officers that AMR had again reported to 911 that a witness reported shots from a shotgun at the Shumway residence.

The officers then went to the defendant's nearby residence at 1008 N.W. Van Buren. From outside the gate of the high metal fence surrounding the house, the officers saw a camouflage-colored shotgun, resting on the roof which covers the narrow porch extending across the front of the house. This narrow roof area extends only a few feet out from the house, and is immediately below two second story windows on the front of the house.

Seeing smoke from the backyard, the officers then walked around the back of the house, where they found a small fire burning, and a white male getting into the driver's seat of a vehicle parked in the alley just on the other side of the backyard fence. The man told officers that he was there to visit the defendant, but said he was not at home.

Around this time, Joy Burchfiel arrived at the residence. She stated that she owned the house and paid all the bills on it, and offered to let the officers into the house to retrieve the shotgun, or to get a ladder and retrieve it herself. The officers declined this offer after communicating with dispatch, and learning that the house was listed in the name of one Charles Porubski.

Joy Burchfiel indicated that she believed the defendant was inside, but when the officers knocked on the door they received no answer. They could see lights on in the two windows just above the place where the shotgun rested.

The video shows that the officers were at the residence for at least half an hour, during which time they discussed with a supervisor the best approach to the situation. During this time, another officer interviewed the AMR employee who had called 911.

The man reported he had been driving north on Harrison in the 1000 block when he noticed on the east side of the street a shirtless, tattooed, bald, white male (matching the description that officers had been given of the defendant) yelling at the occupants of a residence. He heard a large boom coming from the area where the yelling was occurring, looked over to that area, and saw the shirtless, tattooed, bald, white male running east in the alleyway towards N.W. Van Buren Street and carrying a shotgun.

Officer Schwinn asked Joy Burchfiel if the shotgun on the roof was the only firearm that the defendant had. She said she did not know he had a shotgun, but based upon the information she had heard over the police radio, this had to be the defendant's shotgun, and the only one she was aware of.

The video indicates that the officers were concerned that further attempts to contact the defendant inside the house might produce a confrontation, or cause defendant to barricade himself inside. At some point, the officers decided to retrieve the shotgun without making contact with the defendant.

Schwinn was selected to retrieve the shotgun because he was smaller and would present a more difficult target if the defendant was watching. Two officers lifted Schwinn up and he retrieved the shotgun.

It is unclear where the defendant actually was when this occurred. The government, arguing that an exigent circumstances situation existed, contends that the defendant was inside the house, or at least that's where the officers believed him to be.

The defendant argues there was no exigency because Burchfiel was not in the house at the time the shotgun was seized.

The video cuts off shortly before the shotgun is retrieved, but the call logs, the video, and the circumstances of the case gave the officers probable cause to believe that the defendant was inside the house. The defendant's argument that Burchfiel was not in the house is an inference grounded on a comment by one of the officers, at 24 minutes into the video, that "I don't want to go up and get it [the shotgun] while he's possibly still inside."

This certainly indicates the officer's *preference* about retrieving the shotgun, but it does not necessarily negate the conclusion that the officers ultimately decided, approximately ten minutes later, to get the shotgun anyway. And indeed, Officer Schwinn credibly testified that the comment on the video was simply the original plan, and the officers decided they needed to retrieve the shotgun from the porch roof without further delay.

At this time, the house was under surveillance from both the front and and the back, and at no time did the officers see the defendant leave the residence. Moreover, just seconds before the comment cited by defendant, the same officer also summarizes the situation by saying, "Mom 90% believes he is inside the house." And earlier, one of the officers is heard to state: "Mom says there's no reason for Big Fish [the man found in the backyard] – whatever that guy goes by – to be here if he's [Burchfiel's] not

5

inside." The court finds that the officers reasonably believed Burchfiel was inside the residence.

Two days later, the defendant was interviewed by law enforcement regarding another criminal matter. After waiving his *Miranda* rights, the defendant said that the shotgun belonged to his brother and that they were messing around with the shotgun on June 17, 2017, and that they both fired it off into the air in the back yard.

The government presents three potential grounds for the admission of the shotgun: (1) the plain view doctrine, (2) abandonment, and (3) exigent circumstances. The government does not argue that the retrieval can be supported based on the consent to search given by the defendant's mother.

The court finds the first two grounds are inadequate to sustain the admission of the shotgun. As to the plain view doctrine, the government accurately sets forth the standard for such seizures:

> The plain-view doctrine states that an officer may seize evidence without a warrant if:
> (1) the officer was lawfully in a position from which to view the object seized in plain view;
> (2) the object's incriminating character was immediately apparent—i.e., that the officer had probable cause to believe the object was contraband or evidence of a crime; and
> (3) the officer had a lawful right of access to the object itself.

*United States v. Williams,* 2019 WL 1244961, at *5, No. 5:18-CR-40069-HLT, Doc. 24 at 10 (D. Kan., 2019) (citing, *inter alia, Coolidge v. New Hampshire*, 403 U.S. 468 (1971)). But the government does not mention or even discuss the third element of this test, which the

6

defendant has emphasized in both his original and reply briefs. That is, while the shotgun was certain in plain view, it was not in an area where the officers otherwise had a lawful right of access.

The argument for abandonment, the court finds, is similarly unpersuasive. The case cited by the government for abandonment, *United States v. Gaines*, ___ F.Supp.3d ___, 2019 WL 3765617, at *6 (D. Kan., 2019), is easily distinguishable. In that case, the court determined that a fleeing defendant abandoned a black pouch containing drugs when he threw it onto a roof – but, as the defendant's reply notes, Gaines threw the pouch onto *someone else's roof*. Here the shotgun was on the roof of Burchfiel's own residence. In addition, the government's claim of abandonment is undercut by the contentions it makes when its stresses the exigency of the situation. Thus, elsewhere in its brief, the government argues that defendant was "clearly trying to conceal the shotgun" by placing it on the roof (p. 8), and placing it "within an arm's reach from the second floor widow." (P. 11). Both conclusions are probably true in themselves, but they also establish that Burchfiel placed the shotgun in an area where he could easily retrieve it — the opposite of abandonment.

Thus, the case turns on the whether the police faced exigent circumstances justifying the retrieval of the shotgun. The defendant argues there was no exigency, and notes that, unlike the case cited by the government, *United States v. Gambino-Zavala*, 539 F.3d 1221, 1225 (10th Cir. 2008),, there was no concern here for potential shooting victims. However, while *Gambino-Zavala* does indeed focus on the exigent

7

circumstances presented by the need to search for potential victims of violence, it is clear that the doctrine is not limited such circumstances alone. *See Croak v. McGinley*, No. CV 16-6670, 2017 WL 2125758, at *9 (E.D. Pa. Apr. 24, 2017), *report and recommendation adopted*, No. CV 16-6670, 2017 WL 2126319 (E.D. Pa. May 15, 2017) (summarizing *Minnesota v. Olson*, 495 U.S. 91, 100 (1990) as "recogniz[ing] several types of exigent circumstances that may justify a warrantless entry into a home, including the hot pursuit of a fleeing felon, the imminent destruction of evidence, the need to prevent a suspect's escape, or the risk of danger to police officers or other people inside or outside the home"). That is, the doctrine is a flexible one which allows a warrantless search or seizure where "(1) the officers have an objectively reasonable basis to believe there is an immediate need to protect the lives or safety of ... others, and (2) the manner and scope of the search is reasonable." *United States v. Najar*, 451 F.3d 710, 718 (10th Cir. 2006). The court balances the degree of potential danger and the extent of the intrusion.

There is a distinct body of authority applying the doctrine of exigent circumstances to uphold the seizure of firearms which are unsecured and accessible to the public. That is, as a general matter, "the police have the right to secure firearms that are unattended and pose a risk that the public will find the weapon." *United States v. Castillo*, 48 F. App'x 611, 613 (9th Cir. 2002) (citing *New York v. Quarles*, 467 U.S. 649, 656–58, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984)). Thus, several cases, including *Croak*, have recognized that the doctrine of exigent circumstances may warrant the temporary seizure of a firearm to minimize the risk of violence. In *Croak*, the court held that an

8

officer was justified in temporarily seizing a firearm based on its potentially being accessed by a third party:

> Officer Cabrera saw through the door window that Croak had a gun that he placed in the vicinity of the entryway, and knew that Croak was a convicted felon who could not lawfully possess a firearm. He was also aware of the possibility of another individual in the house based on his observation that a car registered to someone else was parked outside the residence, which Croak confirmed. Officer Cabrera then proceeded inside the house where he encountered the other individual on the couch and asked for him to keep his hands in plain view while he retrieved the gun. His intrusion into the home was minimal: he did not conduct a detailed search of the residence, but rather briefly went inside the entryway of the house to retrieve the gun. Under these circumstances, Officer Cabrera's response, an extremely modest intrusion into the home to recover the firearm by the door, was amply tailored to the exigency he faced.

(Record citations omitted).

Other courts have reached similar conclusions. *See United States v. Webb*, 83 F.3d 913, 917 (7th Cir. 1996) (doctrine supported retrieval of firearm which defendant was seen to toss into trunk of automobile, where the keys were left in the vehicle and "[l]eft unattended, the gun easily could have been retrieved by anyone passing the car, [the officer] testified that he feared that the firearm might go off accidentally because the safety mechanism might not have been activated [with the result that] the gun was easily accessible and was in an unknown condition"); *United States v. Taylor*, 179 Fed.Appx. 957, 959-60 (7th Cir. 2006) (warrantless entry into home justified "to ensure that no one posed a threat to them or anyone else" where, although suspect was observed leaving the house, officers knew that a gun was likely within the home); *United States v. Owen*, 65 F.Supp.3d 1273, 1287 (N.D. Okla. 2014) (officer's warrantless

9

entry into bedroom was justified to forestall and protect a child who had gone into the bedroom to retrieve it). *Cf. United States v. Graham*, 686 F. App'x 166 (4th Cir. 2017) (exigent circumstances do not automatically justify seizing any firearm at a scene, and having arrested the defendant, officers were not justified in later seizing handgun hidden under the front seat of his truck, where there was no evidence that any bystanders knew about the gun).

Perhaps most factually similar of these cases is *United States v. Bennett*, 2011 WL 2199570, *5 (N.D. Ind. 2011), in which police responded to a 911 report of shots being fired. When the officers arrived, they saw the obviously intoxicated defendant shoot a gun from his porch and then reenter his house. When he returned, without the gun, he was arrested by the police. The court held that the officers' decision to briefly enter the house to retrieve the firearm was justified by exigent circumstances – even though the defendant had by then been placed under arrest:

> Officer Ealing had no way of knowing the condition of the gun, but could reasonably assume that it was still loaded and was not rendered safe given the Defendant's reckless behavior and state of intoxication. The gun may have been less accessible inside a house than in the trunk of a car [as in *Webb*], but the difference is not sufficient to distinguish the outcome, particularly because other individuals would remain inside the house as the police left with the Defendant in their custody. The Defendant's relatives and Harris would be free to retrieve the weapon and could attempt to use it against the police as they left the scene if the gun was not recovered. The gun still remained a safety threat until the police could take possession of the weapon. Thus, the police had an objectively reasonable basis for believing that immediate official action was required to locate the gun that the Defendant had hidden inside the house moments before they began their search for it.

2011 WL 2199570, at *5 (citation omitted).

Also analogous is *United States v. Davis*, 710 F. App'x 805, 807 (11th Cir. 2017), where officers attempted to execute a *Terry* stop on the defendant, who fled and threw a firearm onto the roof of his house. This occurred in a high-crime area, the officers knew that the defendant was a felon, and it was raining. One of the officers climbed onto the roof and retrieved the firearm. The Eleventh Circuit rejected defendant's argument that exigent circumstances did not exist, noting that "Officers Mooney and Myers testified they were concerned about the dissipation of DNA evidence from the gun that could occur from precipitation on the exposed roof during the several hours it could have taken to secure a warrant, or that a resident of the house could remove the firearm, alter the DNA evidence on it, or use it against the police." *Id*. at 807.

The video and the testimony in this case establish that it was also raining at the scene. Further, there is a stronger basis for application of the doctrine of exigent circumstances than in some of the other cases. The firearm had been left in an even more accessible condition than either *Webb* or *Bennett* — it was just above the door to the residence and visible to anyone on the sidewalk, and the defendant was not in custody. Further, the intrusion was minimal: (1) the officers did not enter into Burchfiel's house or into any area hidden from public view, (2) they did not stay for any significant amount of time, and (3) their seizure only served to deprive the defendant of an item that he could not legally possess. This limited intrusion is coupled with a substantial reason for concern. The defendant (whether in the house or not) was not in custody. The

shotgun was visible and easily accessible. The officers had reports that the defendant was on parole, was intoxicated, was "out of control," had been damaging property at his brother's house, and had been firing a shotgun in a residential neighborhood.

Given all the circumstances of the case, the court finds that the limited intrusion of taking the shotgun was a reasonable action to ensure public safety.

IT IS ACCORDINGLY ORDERED this day of January, 2020, that the defendant's Motion to Suppress (Dkt. 29) is hereby denied.

J. Thomas Marten<br>J. Thomas Marten, Judge